Filed 10/27/14  P. v. Pachito CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>AARON ELI PACHITO,<br><br>    Defendant and Appellant. | D063925<br><br><br>(Super. Ct. No. SCD233973) |

APPEAL from a judgment of the Superior Court of San Diego County, Charles G. Rogers, Judge.  Affirmed.

Charles M. Sevilla for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Elizabeth M. Carino, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Aaron Eli Pachito of making a criminal threat against his former girlfriend. (Pen. Code, § 422.)[1] He admitted to two prior serious felony convictions within the meaning of the three strikes law (§§ 667, subds. (b)-(i); 1192.7, subd. (c)), but the trial court struck one of them as invalid. The court sentenced him to 11 years in prison, consisting of the upper term of three years for the criminal threat, doubled, and a consecutive five-year term for the strike prior (§ 667, subds. (a)(1) & (e)(1)).

On appeal, Pachito challenges the sufficiency of the evidence to support his conviction under section 422. He also contends the court erred by not sua sponte instructing the jury on the lesser included offense of attempted criminal threat, and by instructing the jury with CALCRIM Nos. 358 and 359 regarding his extrajudicial statements, which ostensibly lessened the People's burden of proof. Further, he contends the court abused its discretion by admitting evidence of the victim's knowledge he had served prison time and had been on parole, and by admitting evidence of his domestic violence toward a third party under Evidence Code sections 1101, subdivision (b) and 1109. We affirm the judgment.

---

[1]     Further statutory references are to the Penal Code except when otherwise specified.

2

FACTS

Durae Delisle and Pachito began a relationship in 2007, and she gave birth to their daughter, N.P., in 2009. Pachito has a history of domestic violence toward Delisle, particularly when under the influence of alcohol.

In the spring of 2008, he slapped her in the face after hearing a message a man left on her phone. A few months later, he threw a cup of coffee at her face. It split her lip and broke a front tooth, requiring a root canal. In December 2008, he came home from a sporting event "very, very drunk," "went on and on" about how much he hated her religion, and struck her "very hard" on the side of her head, popping her eardrum. As she lay on the floor crying, he kicked her and smashed her head several times into a cupboard. She went to urgent care, and had pain in her ear for two to three weeks and difficulty hearing.

On December 12, 2008, an officer with the San Diego Police Department responded to a call from Delisle. She had been crying, and she told the officer that she broke up with Pachito a few days earlier and he "wanted to physically fight with her and punch her face." She reported the cup incident to the officer.

In February 2009, when Delisle was two months pregnant, Pachito punched her in the stomach because he was upset about the pregnancy. About a month later, he became upset because she was crying while reading an e-mail. He was drunk, and he put both hands around her neck and choked her "really bad" until she "start[ed] to get dizzy." He stopped for a few seconds, but then resumed choking her. She knew from experience that if she pretended to be calm he would calm down.

3

In approximately April 2010, Pachito punched Delisle in the leg while she was seated on a bed along with N.P. He had agreed to stop drinking and abusing her. He was not drinking this time, which made her believe he would never stop the abuse. After this incident she took N.P. and left the area for several months.

At one point, Delisle went to Seattle, Washington, and stayed with a friend. Pachito joined her in Seattle and they spent the night in a hotel. The following day "he got really mad that he was spending so much money on hotel rooms" when he could be staying at the friend's house. The friend was afraid of Pachito and Delisle promised not to reveal the friend's address to him. He screamed at her as she was driving, and she pulled over and told him to get out of the car. He refused. She went into a cafe and called the police because she was afraid of him. When they arrived, he fled.

In September 2010, Delisle returned to San Diego because she wanted to get orders for custody and child support. In October 2010, she reported to a police officer that "she got into an argument with her boyfriend, and he pushed her while she was holding their one-year-old daughter." She told the officer "[s]he was afraid of him and ran out of the house to the neighbor's house next door and had the neighbors call 911."

In January 2011, Delisle obtained a restraining order against Pachito. According to Delisle, child protective services intended to remove N.P. from her custody unless she obtained one. Delisle and Pachito agreed he would have reasonable visitation with N.P.

Pachito broke the restraining order by calling her "nonstop" about resuming their relationship. She did not want to do so because he was "drinking continuously," and sometimes when he drank he was "very violent."

4

In January 2011, Delisle reported to a police officer that he made 35 calls to her within a few hours. The officer arrested Pachito for violating the restraining order. Pachito told the officer he knew about the order, but he continued to call her because he "needed to know whether or not she was dating someone else so that if she was, he could move on with his life." He admitted to the officer that he had physically abused her.

In one of Pachito's calls to Delisle, he commented that he could pick the lock of her apartment door. That concerned her because she lived in "a very old building" and "it would have been so easy to break inside." She asked the police to give her safety tips, and they helped her with window locks and showed her "how to block a door with a chair."

One night in February or March 2011, Delisle left her apartment to retrieve something from her car. Pachito was outside her apartment, and he was "very upset" because he had gotten into her e-mail account and saw she was corresponding with a man. He put one hand around her neck and choked her for approximately five seconds. After this incident, she obtained a criminal protective order against him.

The night of March 24, 2011, Delisle received between 10 and 15 phone calls while she was driving home. She believed they were from Pachito and she ignored them. When she arrived outside of her apartment she called him. She could tell from his tone of voice that he was "very, very angry," "angrier than usual." He wanted to see N.P. the following day, and Delisle had not called him for several days to schedule visitation.

During the call, Pachito stated, "You're lucky you called me, you fucking bitch, because I was just about to come over there and knock down your front door and murder

5

you." He added, "I'm not going to hurt you, I'm going to murder you, and the restraining order is not going to protect you and the police aren't going to protect you." He also said something to the effect of, "Why the fuck didn't you answer your phone after I called you 10 times, you fucking bitch."

Delisle knew Pachito was at his home, which was approximately 10 to 15 minutes from her apartment by car. She testified, "I was afraid he was going to come over," and, "when he's drinking, if he comes over to my house, it's not a good situation." When asked whether he could be violent, she responded, "Of course." Further, child protective services had been at her home that morning, and she believed she should report the incident to avoid having N.P. removed from her custody.[2] She testified, "I'm afraid of him. I'm afraid of child protective services. I'm afraid of there being proof that he's calling me and I'm not reporting it. I'm afraid of the whole situation. It's a nightmare."

She decided to flag down a police officer to report the threats. She also decided to spend the night in a hotel, and as a "safety precaution" she asked the officer, Cary Ochab, to escort her to her apartment and wait outside with N.P. while she grabbed some clothes. She paid approximately $60 for a room, money she would rather have had for other expenses. She returned home the next day and Pachito left her alone for several months.[3]

---

[2] Delisle testified child protective services had visited her three times after N.P.'s name showed up in police reports pertaining to Pachito's conduct.

[3] The preliminary hearing was held in July 2011. The same month, Delisle contacted Pachito and asked him to pay his ordered child support. Between then and September of that year they saw each other about five times and had sexual relations twice. He asked her to lie about his March 24, 2011, phone call, but she refused. After

6

Officer Ochab testified Delisle "appeared nervous, anxious, almost like physically shaking, like she was concerned about something." His report stated she told him Pachito said, "Why the fuck didn't you answer the phone after I called you 10 times, you fucking bitch? I was about to come over and knock down your front door and kill you. I'm not going to hurt you, I'm just going to come over and murder you."

While Delisle was speaking with Ochab, Pachito phoned her. She put the call on speaker phone. She told Pachito he should not be calling her, and he responded, "I don't care if you have a restraining order. It can't protect you," and, "I'm not afraid of the police." Ochab could "hear a male's voice going on a rant, yelling and screaming over the phone, making some reference to seeing his daughter." Ochab attempted to interrupt Pachito several times, but he "continued with his yelling and screaming."

Ochab later phoned Pachito and "asked him about the threat that he made and kind of cautioned him about making such threats, especially if he was concerned about child custody in the future." Pachito asked Ochab, "am I going out with her, if I was fucking her." Pachito did not deny threatening Delisle, but said "he would never hurt her." Pachito "tended to agree . . . that he should probably be a little more cautious with what he says towards Delisle." He asked Ochab "numerous times if I could just drop the case."

John Serrano, an investigator with the district attorney's office, conducted a recorded interview of Delisle in May 2011. When asked whether she denied being afraid of Pachito, Serrano testified, "No. She was definitely afraid of him." He added, "She

he was rude to her, she ended the relationship because it reminded her "of his old ways" and she was afraid the violence would resume.

7

said that she was constantly having to watch her back; she wasn't sure if he was perhaps sitting down the street, watching her come home, so she was definitely fearful of him." Delisle told Serrano she was afraid to spend the night of March 24, 2011, at her home, "and she said she wanted to spend the money [on a hotel room] to make sure that she was safe."

Josette Basso testified she and Pachito began a relationship in 2001 or 2002, and he was frequently violent toward her. The first time, they were driving when he became angry over something "silly" and slapped her. In 2002 they went to Big Bear and were having a good time in a bar, when he became "very upset" when he felt she stayed in the restroom too long. He ushered her outside, where they argued. He grabbed her by the back of her head and pushed her head into a wall.

In 2003, Pachito slapped Basso when she told him she had two male friends coming to visit from out of town. Later that evening, she heard Pachito "screaming and yelling" that if she did not open her front door by the time he counted to 10 he was going to "kick the door in." He counted to five and kicked the door in, cracking it in half. He ran up the stairs and began choking one of her friends, who was sleeping on a couch. Basso threw her mobile phone to the friend and told him to call the police, at which point Pachito punched her, causing "a very ugly black eye."

Pachito and Basso were once kicked out of a bar after he made derogatory remarks to the female bartender. He became angry and Basso did not feel safe so she left in her car. She parked on a residential street and waited, hoping he would "sober up and be in a better mood later." She eventually phoned him, and he told her to "get to his house

8

immediately."  He met her at her car, took her purse, and guided her into his apartment. He rifled through her purse for her car keys, but could not find them.  When she refused his request for the keys, he punched her in the eye, causing profuse bleeding.  He took her to a hospital and she required 19 stitches over her eye.

In April 2004, Pachito sent Basso threatening text messages, and then showed up at her home and threatened to hurt or kill her and her parents.  At the time, a criminal case was pending against him for assaulting her, and he demanded that she not testify against him.  She explained, "I was scared for my life" because "I believe he's capable of it."  She called the police, and the officer who responded retrieved text messages from Basso's phone that stated, "F cunt, your dead same w family"; "Liars, suffer or die!"; and, "Kill you if you dare think cheating J no excuses!"

## DISCUSSION

## I

### *Sufficiency of the Evidence*

Pachito challenges the sufficiency of the evidence to support his conviction for making a criminal threat within the meaning of section 422.  "Our review of any claim of insufficiency of the evidence is limited.  ' "In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.]  Reversal on this ground is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].'

9

[Citations.]" [Citation.]' " (*People v. Sanchez* (2003) 113 Cal.App.4th 325, 329; *People v. Johnson* (1980) 26 Cal.3d 557, 578.) "A reviewing court is precluded from making its own subjective determination of guilt. [Citation.] It is the exclusive function of the trier of fact to assess the credibility of witnesses and draw reasonable inferences from the evidence." (*Sanchez,* at p. 330.)

The court instructed the jury with CALCRIM No. 1300, as follows: "The defendant is charged . . . with having made a criminal threat in violation of . . . section 422. [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant willfully threatened to unlawfully kill or unlawfully cause great bodily injury to . . . Delisle; [¶] 2. The defendant made the threat orally or by electronic communication device; [¶] 3. The defendant intended that his statement be understood as a threat; [¶] 4. The threat was so clear, immediate, unconditional, and specific that it communicated to . . . Delisle a serious intention and the immediate prospect that the threat would be carried out; [¶] 5. The threat actually caused . . . Delisle to be in sustained fear for her own safety or for the safety of her immediate family; [¶] AND [¶] 6. . . . Delisle's fear was reasonable under the circumstances."[4]

---

[4]    The instruction also provided: "Someone commits an act *willfully* when he or she does it willingly or on purpose. [¶] In deciding whether a threat was sufficiently clear, immediate, unconditional, and specific, consider the words themselves, as well as the surrounding circumstances. [¶] Someone who intends that a statement be understood as a threat does not have to actually intend to carry out the threatened act [or intend to have someone else do so]. [¶] *Great bodily injury* means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm. [¶] *Sustained fear* means fear for a period of time that is more than momentary, fleeting, or transitory. [¶] An immediate ability to carry out the threat is not required."

Pachito asserts the evidence was insufficient to prove "a present or future threat" or that Delisle "felt that the phone communication with [him] communicated an immediate and specific threat to inflict great bodily injury." He claims his "angry statement was but a hyperbolic rant of what purportedly would have been done had Delisle not called him back. It was a statement premised in the past tense and not a threat of present or future conduct given that Delisle finally called him back." He points to her testimony that he said, "You're lucky you called me, you fucking bitch, *because I was just about to come over there* and knock down your front door and murder you." (Italics added.)

We disagree with Pachito. "A prosecution 'under section 422 *does not* require an unconditional threat of death or great bodily injury.' " (*People v. Wilson* (2010) 186 Cal.App.4th 789, 806, quoting *People v. Bolin* (1998) 18 Cal.4th 297, 339.) "[I]mposing an 'unconditional' requirement ignores the statutory [section 422] qualification that the threat must be '*so* . . . unconditional . . . *as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution* . . . .' " (*Bolin,* at pp. 339-340.) " 'The use of the word "so" indicates that unequivocality, unconditionality, immediacy and specificity are not absolutely mandated, but must be sufficiently present in the threat and surrounding circumstances to convey gravity of purpose and immediate prospect of execution to the victim.' [Citation.] 'If the fact that a threat is conditioned on something occurring renders it not a true threat, there would have been no need to include in the statement the word "so." ' [Citation.] This provision 'implies that there are different degrees of unconditionality. A threat which may appear conditional on its face can be

11

unconditional under the circumstances. . . ." (*Ibid.*) The relevant circumstances include "the defendant's mannerisms, affect, and actions involved in making the threat" (*People v. Solis* (2001) 90 Cal.App.4th 1002, 1013), and the parties' history. (*People v. Smith* (2009) 178 Cal.App.4th 475, 480; *In re George T.* (2004) 33 Cal.4th 620, 637 [history of animosity and conflict is relevant].)

Despite Pachito's use of conditional language, the circumstances here amply support a conviction under section 422. Pachito had a history of physically abusing Delisle, and thus she was certainly aware he was capable of inflicting great bodily harm. (See *People v. Gaut* (2002) 95 Cal.App.4th 1425, 1431 [although the defendant's threat was made from prison, the victim's fear he would be released soon and follow up on threat was reasonable because of his prior assaults]; *People v. Franz* (2001) 88 Cal.App.4th 1426, 1448-1449 [although the defendant's threat was made as he was being arrested, the victim's fear of immediate harm was reasonable because of his prior assault]; *People v. Garrett* (1994) 30 Cal.App.4th 962, 967 (*Garrett*) [evidence that wife had been a victim of the defendant's violence was "thoroughly germane" to issue of whether his threat caused sustained fear within meaning of § 422].)

Further, Delisle testified that when he made the threat she could tell from his tone of voice that he was "very, very angry," "angrier than usual." Additionally, Officer Ochab testified Delisle was visibly upset, and he heard Pachito ranting on speaker phone. Pachito had previously told her he could pick the lock on her apartment door, and she was so frightened he would show up there and harm her that she decided to spend the

12

night in a hotel, and as a safety precaution she requested a police escort to her apartment so she could retrieve clothing.

Moreover, Delisle testified that Pachito also threatened, "I'm not going to hurt you, *I'm going to murder you*, and the restraining order is not going to protect you and the police aren't going to protect you." (Italics added.) This statement is in the present tense and not conditioned on Delisle returning his call. "Our sole function is to determine if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*People v. Smith, supra,* 178 Cal.App.4th at p. 478.) We conclude substantial evidence supports the verdict.

## II

### *Instructional Issues*

### A

### *Attempted Criminal Threat*

Alternatively, Pachito contends that even if substantial evidence supports the conviction, it must be reversed because the court failed to instruct sua sponte on the lesser included charge of attempted criminal threat. (*People v. Toledo* (2001) 26 Cal.4th 221, 224, 230-232 (*Toledo*); §§ 664, 422.) This issue is subject to a de novo standard of review. (*People v. Waidla* (2000) 22 Cal.4th 690, 733.)

A "trial court errs if it fails to instruct, sua sponte, on all theories of a lesser included offense which find substantial support in the evidence. On the other hand, the court is not obliged to instruct on theories that have no such evidentiary support." (*People v. Breverman* (1998) 19 Cal.4th 142, 162.) The "existence of '*any* evidence, no

13

matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury. [Citations.] 'Substantial evidence' in this context is ' "evidence from which a jury composed of reasonable [persons] could . . . conclude[]" ' that the lesser offense, but not the greater, was committed." (*Ibid.*) "In deciding whether there is substantial evidence of a lesser offense, courts should not evaluate the credibility of witnesses, a task for the jury." (*Ibid.*)

"[I]f a defendant, . . . acting with the requisite intent, makes a sufficient threat that is received and understood by the threatened person, but, for whatever reason, the threat does not *actually* cause the threatened person to be in sustained fear for his or her safety even though, under the circumstances, that person reasonably could have been placed in such fear, the defendant properly may be found to have committed the offense of attempted criminal threat." (*Toledo, supra,* 26 Cal.4th at p. 231.) In this situation, "only a fortuity, not intended by the defendant, has prevented the defendant from perpetrating the completed offense of criminal threat itself." (*Ibid.*)

Pachito asserts the evidence supports a reasonable finding his threat did not cause Delisle to experience sustained fear. Pachito cites defense counsel's question, "Has he ever said things to you that you know not to take seriously?" and her responses, "Yes, all the time," "Very frequently," "He would say things all the time that he didn't mean, sober or drunk, and I didn't take them literally," and, "He's a bully. You know, he likes to bully with his mouth a lot." This testimony, however, is unavailing because it does not pertain

14

to Pachito's threats of March 24, 2011. It was merely general information about their relationship.

Pachito also claims Delisle's testimony "indicated she did not believe [he] had a serious intention to 'murder' her." He cites her testimony, "I didn't take it literally that he was going to come over and murder me, I knew there was some seriousness, but him coming over and literally murdering me was not a thing that would go through my mind." This is also unavailing because Delisle's testimony established she feared great bodily harm. In the last sentence of the testimony Pachito quotes, Delisle added, "It was more thinking of the present moment and thinking he could come over here *and I could be in a very dangerous situation*." (Italics added.) Delisle testified she feared he would inadvertently kill her during an assault. She explained: "I think that if he was to kill me that it would have happened unintentionally, because he's a very strong man. He's unaware of his strength and his actions when he's drunk, and it just takes one hit to the head and I could be dead. [¶] So I think when he threats [*sic*] to come over and he's drunk, I am *scared for my safety and I am aware that I could get killed*." (Italics added.)

Pachito reiterates his assertion his threat was conditioned on Delisle's refusal to take his calls, and "the condition for a real threat was over." As discussed, however, Pachito's threat was not entirely conditional. Rather, he also stated, "I'm not going to hurt you, *I'm going to murder you*, and the restraining order is not going to protect you and the police aren't going to protect you." (Italics added.) The evidence he points to does not show that fortuity prevented his completed criminal threat. Because substantial evidence

15

would not support a finding that Delisle did not experience sustained fear, there was no instructional error.

In any event, any arguable error was harmless.  We review the failure to instruct on a lesser included offense to determine whether, " 'after an examination of the entire cause, including the evidence' [citation], it appears 'reasonably probable' the defendant would have obtained a more favorable outcome had the error not occurred [citation]." (*People v. Breverman, supra,* 19 Cal.4th at p. 178, quoting *People v. Watson* (1956) 46 Cal.2d 818, 836.)  In making this evaluation, we "may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result." (*Breverman,* at p. 177.)

The evidence showing Delisle's sustained fear of Pachito *at the relevant time* was overwhelming.  This case is not akin to *Toledo, supra,* 26 Cal.4th at page 225, where the victim denied at trial that her husband's threats caused her any fear.  Delisle testified unequivocally several times that Pachito's threats caused her to be in fear, based on his tone of voice, his language, and his history of physical violence toward her.  She went to a hotel for the night because she feared he would come to her apartment and harm her. Officer Ochab testified she was visibly shaken.  The district attorney's investigator testified she expressed fear.  Indeed, there was insufficient evidence to support a

16

reasonable finding she was *not* afraid of Pachito for a sustained period.[5]  While the jury asked some questions during deliberation, we disagree with Pachito's assertion this was a close case.  No reasonable jury would have convicted Pachito of the lesser offense of attempted criminal threat, and thus any possible error does not require reversal.

B

*CALCRIM Nos. 358 and 359*

Pachito also contends the court erred by instructing the jury with CALCRIM Nos. 358[6] and 359.[7]  He asserts the instructions are inapplicable when, as here, the defendant's

---

[5]     In August 2011, after the preliminary hearing, Delisle provided Pachito's defense counsel with a letter that stated:  " . . . I would like to say that when [the deputy district attorney] interviewed me, one of the first questions she asked me was, 'Are you afraid of Mr. Pachito?'  My reply was, 'No, I am not.' "  The letter does not pertain to Delisle's state of mind on March 24, 2011.  At trial, Delisle testified that when the deputy district attorney interviewed her in May 2011, Pachito "had left me alone at that time for over a month, which never happens."  Delisle clarified that she was afraid of Pachito on March 24, 2011, when he threatened her.  She also testified she was scared to live in her apartment during the time leading up to March 24, 2011, and she was constantly looking over her shoulder to see if Pachito was parked nearby.

[6]     CALCRIM No. 358, as given to the jury, provided:  "You have heard evidence that the defendant made oral or written statements before the trial.  You must decide whether the defendant made any of these statements, in whole or in part.  If you decide that the defendant made such statements, consider the statements, along with all the other evidence, in reaching your verdict.  It is up to you to decide how much importance to give to the statements.  [¶]  Consider with caution any statement made by the defendant tending to show his guilt unless the statement was written or otherwise recorded."

[7]     CALCRIM No. 359, as given to the jury, provided:  "The defendant may not be convicted of any crime based on his out-of-court statements alone.  You may only rely on the defendant's out-of-court statements to convict him if you conclude that other evidence shows that the charged crime was committed.  [¶] That other evidence may be slight and need only be enough to support a reasonable inference that a crime was committed. [¶] The identity of the person who committed the crime may be proved by the defendant's

17

extrajudicial statements constituted the crime, and they lessened the People's burden of proving their case beyond a reasonable doubt.

Pachito relies on *People v. Zichko* (2004) 118 Cal.App.4th 1055 (*Zichko*), in which the defendant was convicted of making criminal threats. On appeal, the defendant asserted the trial court erred by not sua sponte instructing the jury with CALJIC No. 2.71,[8] which applies to "admissions,"[9] whereas CALCRIM Nos. 358 and 359 apply more broadly to statements. *Zichko* concluded there was no error because the "statements constituted the crime, not admissions of the crime within the meaning of CALJIC No. 2.71." (*Zichko*, at p. 1059.) The defendant's "threat to the bank teller did not acknowledge the crime; making the threat was the crime." (*Id.* at p. 1060.)

*Zichko* adds, "instructing the jury with CALJIC No. 2.71 in this case would have been inconsistent with the reasonable doubt standard of proof. The purpose of CALJIC No. 2.71 is to direct the jury to use caution in deciding whether an admission was made. Here, as the trial court instructed, the People had the burden of proving Zichko guilty

---

statements alone. [¶] You may not convict the defendant unless the People have proved his guilt beyond a reasonable doubt."

[8]    The version of CALJIC No. 2.17 used in *Zichko* provided:  " 'An admission is a statement made by [a] [the] defendant which does not by itself acknowledge [his] [her] guilt of the crime[s] for which the defendant is on trial, but which statement tends to prove [his] [her] guilt when considered with the rest of the evidence. [¶] You are the exclusive judges as to whether the defendant made an admission, and if so, whether that statement is true in whole or in part. [¶] [Evidence of an oral admission of [a] [the] defendant not made in court should be viewed with caution.]' " (*Zichko, supra,* 118 Cal.App.4th at p. 1058, fn. 2.)

[9]    "An admission is often compared to a confession. A confession is a declaration, or acknowledgment sufficient to establish guilt of the crime." (*Zichko, supra,* 118 Cal.App.4th at p. 1059.)

beyond a reasonable doubt and that he must be found not guilty unless the elements of the crime were proven beyond a reasonable doubt. Therefore, a guilty verdict required the jury to conclude beyond a reasonable doubt that Zichko made the threatening statements. To also instruct the jury that the statements 'should be viewed with caution' (CALJIC No. 2.71) would have been at least superfluous and may have been confusing to the jury." (*Zichko, supra,* 118 Cal.App.4th at p. 1060.)[10]

Even if *Zichko* applies to CALCRIM Nos. 358 and 359, here, unlike the situation in *Zichko*, there was evidence of extrajudicial statements Pachito made that did *not* constitute the charged crime. For instance, Officer Ochab testified he spoke by phone with Pachito later on the evening of March 24, 2011, and he tried to clarify . . . am I going out with her, if I was fucking her." Further, Ochab testified Pachito "tended to agree with me that he should probably be a little more cautious with what he says towards Delisle," and he asked the officer "numerous times if I could just drop the case." Additionally, Ochab testified he heard Pachito say to Delisle, "I don't care if you have a restraining order. It can't protect you," and, "I'm not afraid of the police."

Pachito asserts these statements are not admissions. They are, however, among the circumstances the jury was entitled to consider when assessing whether the elements of a criminal threat were proven. As Pachito points out, "a jury can properly consider a

---

10    The California Supreme Court is currently considering the issue of whether a cautionary instruction is required sua sponte when the statements at issue constituted the criminal act. (*People v. Diaz* (2012) 208 Cal.App.4th 711, review granted Nov. 20, 2012, S205145.)

later action taken by a defendant in evaluating whether the crime of making a [criminal] threat has been committed." (*People v. Solis, supra,* 90 Cal.App.4th at p. 1014.)

Pachito acceded to the use of CALCRIM Nos. 358 and 359, and he did not request that the instructions be limited to particular statements. (See *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 122 [failure to request limiting instruction constitutes forfeiture of appellate review].) Moreover, Pachito has not shown any prejudice. The trial court instructed the jury to consider all instructions together (CALCRIM No. 200). It also instructed the jury on the elements of criminal threat (CALCRIM No. 1300), and on the prosecution's burden to prove each element of the crime beyond a reasonable doubt (CALCRIM No. 220). Further, CALJIC No. 359 actually benefited Pachito by warning the jury that before considering the content of his threats as testified to by Delisle, it should determine whether he actually made them. Additionally, CALJIC No. 359 provided, "You may not convict the defendant unless the People have proved his guilt beyond a reasonable doubt." We conclude a jury could not reasonably interpret CALCRIM Nos. 358 and 359 as lowering the prosecution's burden of proof.

## III

### *Evidentiary Issues*

#### A

#### *Prison/Parole References*

##### 1

Additionally, Pachito contends the court abused its discretion by allowing evidence he had served prison terms and been on parole, over his objection under Evidence Code section 352. We disagree.

"Relevant evidence is evidence 'having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.' [Citation.] On appeal we consider '(1) whether the challenged evidence satisfied the "relevancy" requirement set forth in Evidence Code section 210, and (2) if the evidence was relevant, whether the trial court abused its discretion under Evidence Code section 352 in finding that the probative value of the [evidence] was not substantially outweighed by the probability that its admission would create a substantial danger of undue prejudice.' [Citation.] 'The trial court is vested with wide discretion in determining the relevance of evidence,' although a court 'has no discretion to admit irrelevant evidence.' " (*People v. Alexander* (2010) 49 Cal.4th 846, 903-904.) "We will reverse only if the court's ruling was 'arbitrary, whimsical, or capricious as a matter of law. [Citation.]' " (*People v. Branch* (2001) 91 Cal.App.4th 274, 282.)

Generally, "proof of the commission of other and unrelated crimes is inadmissible." (*People v. Ozuna* (1963) 213 Cal.App.2d 338, 341.) In *Ozuna,* which

Pachito cites, a police officer testified the defendant stated he was an ex-convict. The trial court determined the evidence was inadmissible and admonished the jury to disregard it. The appellate court reversed the judgment, concluding the evidence had no relevance to the current offense, it was intentionally produced "to prove [the] defendant's debased character and criminal disposition" (*id.* at p. 341), and the admonishment could not cure the prejudicial effect. (*Id.* at p. 342.)

*Ozuna,* however, is not a criminal threat case, and evidence of other crimes "may be admitted when it tends directly to establish the crime charged by proving a material fact . . . ." (*People v. Albertson* (1944) 23 Cal.2d 550, 576.) In *Garrett*, the defendant was prosecuted under section 422 after telling his wife, "[Y]ou better sit here on this god damned phone and listen to me, because when I get off this phone, I'm coming there to put a bullet in your head." (*Garrett, supra,* 30 Cal.App.4th at p. 965.) Over the defendant's objection under Evidence Code section 352, the trial court allowed evidence that the wife knew he had been convicted of voluntary manslaughter after shooting a man. The appellate court affirmed, concluding the evidence was "extremely relevant and probative in terms of establishing" the element of sustained fear within the meaning of section 422. (*Garrett,* at p. 967.)

*Garrett* explains: "Clearly, . . . the fact that Wife knew that appellant had killed a man with a gun in the past and that appellant was aware that she knew, inasmuch as he was the one to apprise Wife of this fact, is extremely relevant and probative in terms of establishing these elements--i.e., that appellant had the specific intent that his statement that he would 'put a bullet in [Wife's] head,' would be taken as a threat; that upon hearing

22

the statement, Wife was in a state of sustained fear; and that the nature of the statement was such as to convey an immediate prospect of execution of the threat and to render Wife's fear reasonable.  In the same way, evidence that Wife herself had been a past victim of appellant's violence, was thoroughly germane to these issues as well." (*Garrett, supra,* 30 Cal.App.4th at p. 967.)

Further, the court held "upon the facts of this case, it cannot be said that the probative value of the evidence is outweighed by its prejudicial effect.  *Seldom will evidence of a defendant's prior criminal conduct be ruled inadmissible when it is the primary basis for establishing a crucial element of the charged offense.*" (*Garrett, supra,* 30 Cal.App.4th at p. 967, italics added.)  The court rejected the contention the evidence constituted inadmissible propensity evidence under Evidence Code section 1101, subdivision (a), as it "was admitted not for the purpose of showing appellant's disposition to commit the charged offense but, rather, for the purpose of establishing crucial elements of that offense." (*Garrett,* at pp. 967-968.)

Here, in seeking admission of the evidence, the prosecutor advised the court:  "On the January 10th incident, 2011, . . . Delisle told the officer that she was *very scared of the defendant because he had been violent in the past and because he had served time in prison.  That's what she said at that time as a justification for her fear*, and I wanted to advise the court and counsel of that statement.  My concern was her reference to the defendant being in prison, and I wanted to get a ruling from the court as to that. [¶] Similarly, on January 14th, when the defendant talked to an officer -- a different officer -- he admitted that he had abused . . . Delisle in the past when he was on parole,

23

and so there is a reference there to 'parole,' and I wanted to, again, get the court's ruling on these particular matters. [¶] I would submit to the court that each is relevant. *Part of the reason that . . . Delisle was afraid was because of the defendant serving time in prison.* And the defendant admitted that he had abused [her] in the past. He put it in a time frame when he was on parole, and so I would submit that the reference to the time frame is relevant." (Italics added.)

The court overruled Pachito's objection under Evidence Code section 352, finding the evidence highly probative on the issue of whether his threats on March 24, 2011, caused Delisle sustained fear within the meaning of section 422. The court added there "is a concern about prejudice, but any prejudicial effect that would flow from it is connected with its relevancy."

At a later conference, the prosecutor sought clarification on the issue. The court again overruled Pachito's objection under Evidence Code section 352, explaining, "It seems to me that a threat from a person who is on probation or parole is likely to engender more fear than one who is not. It also shows an apparent inability of the accused to conform his behavior to the requirements of law."

On this record, we cannot say the court's evidentiary ruling constitutes abuse of discretion. The People were required to prove Panchito's threat actually caused Delisle to be in sustained fear for her safety, and that the fear was reasonable under the circumstances. (CALCRIM No. 1300.) The court reasonably found Delisle's knowledge

24

of Panchito's prison terms and parole status was among the circumstances relevant to the sustained fear issue. (*Garrett, supra,* 30 Cal.App.4th at p. 967.)[11]

Further, while the evidence held potential for undue prejudice, we cannot conclude, as a matter of law, that its probative value was substantially outweighed by the danger of undue prejudice. (Evid. Code, § 352; *People v. Branch, supra,* 91 Cal.App.4th at p. 282.) " 'The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. "[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is 'prejudicial.' The 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying [Evidence Code] section 352, 'prejudicial' is not synonymous with 'damaging.' " [Citation.]' " (*People v. Poplar* (1999) 70 Cal.App.4th 1129, 1138.)

2

Pachito complains that contrary to its offer of proof, the prosecution made no "connection during trial between Delisle's fear prior to or on March 24, 2011, and the fact [he] had been in prison or on parole." He points out that "[s]he was never asked a

---

11      Pachito distinguishes *Garrett* on the ground there was a direct connection between the prior criminal conduct there, voluntary manslaughter by shooting, with the wife's fear that he would act on his threat to shoot her in the head, whereas here, there was no revelation of the type of criminal conduct that resulted in Pachito's imprisonment. The fact that the circumstances here are less egregious than those in *Garrett,* however, is unpersuasive.

question to associate fear with prison or parole and never testified to her fear on the 24th being associated with his having been in prison or on parole."

A police officer testified that in January 2011 he arrested Pachito for violating Delisle's restraining order, at which time he told the officer "he had physically abused her in the past while he was on parole." During Delisle's testimony, the prosecutor asked her what she recalled about an April 2010 incident in which Pachito punched her in the leg. Delisle responded, "We were living together . . . , and he had got out of prison like a few weeks ago, and I was in a very bad mood and we were -- I kind of started to fight with him, and he got really mad at me and punched me in the leg."[12] Pachito asserts that without any evidence linking his status with Delisle's fear, these references were gratuitous.

It is a fundamental rule of appellate practice, however, that in assessing a claim of error "we must consider the facts known to the court at the time the ruling was made. [Citations.] Consequently, we look to the prosecution's offers of proof in determining error." (*People v. Hendrix* (2013) 214 Cal.App.4th 216, 243; *People v. Bacigalupo* (1991) 1 Cal.4th 103, 142 (*Bacigalupo*), judg. vacated and remanded on other grounds

---

[12] Defense counsel actually elicited other testimony Pachito finds objectionable. Delisle denied fearing he would harm their child, adding: "He gave me $5,000 when I was pregnant, and I lived in his apartment while he was in prison -- or his house, I should say, for free. And I remember him giving me a check when [N.P.] was born for, I think, $750, . . . and I can't remember if he gave me money after that or not, but I moved back into his house again in December of 2009 when he was back in prison, and . . . I don't know if he gave me money or not while he was in prison." When defense counsel asked, "Did . . . Pachito live in that house . . . where he paid the rent?" she responded, "He lived there, yes. But while I was living there, he was in prison."

*sub nom. Bacigalupo v. California* (1992) 506 U.S. 802; *People v. Hernandez* (1999) 71 Cal.App.4th 417, 425.) "To do otherwise would require us to hold the trial court to an impossible standard." (*Hernandez,* at p. 425.) Given the prosecution's offer of proof, Pachito has not shown the court's ruling was unreasonable.

When there is a variation between an offer of proof and the evidence adduced at trial, the defendant cannot sit idly by and expect relief on appeal. Rather, he must bring the matter to the trial court's attention as soon as practicable and seek relief. (Evid. Code, § 352; *People v. Champion* (1995) 9 Cal.4th 879, 925 (*Champion*), overruled on another ground in *People v. Combs* (2004) 34 Cal.4th 821, 860; *Bacigalupo, supra,* 1 Cal.4th at p. 142.) A contrary rule would be unfair to the trial court and the People, waste judicial resources, and cause unnecessary delay.

In *Bacigalupo,* the defendant's mother testified to his "kind and generous nature," and the prosecution had offered to prove, through the wife of the murder victim, that the defendant knew when he committed the crime that he "was the father of, and the sole support for, six minor children." (*Bacigalupo, supra,* 1 Cal.4th at p. 142.) The "actual evidence offered on rebuttal, however, showed nothing more than that [the] defendant was in the same room as [the victim's wife] when she mentioned her children. It is not clear from [her] testimony that [the] defendant even overheard her comments or knew who she was. Under these circumstances [the] testimony did not rebut [the] defendant's character evidence or show his personal moral culpability at the time of the murder." (*Ibid.*) The court held, however, that "because [the] defendant never made a motion to strike the testimony actually presented, he may not now complain that its admission was

27

improper." (*Ibid.*; see also, *Champion, supra,* 9 Cal.4th at p. 925 ["To the extent that there were variations between the offer of proof and Deputy Williams's testimony, defendants should have brought them to the court's attention and should have requested that Williams's testimony be stricken."].)

Pachito does not assert he alerted the court to the variation between the prosecution's offer of proof and the actual evidence, and thus the issue is not preserved for appeal. (*Champion, supra,* 9 Cal.4th at p. 925.) He could have requested that the court strike references to prison terms and parole, since there was no testimony connecting the references to Delisle's heightened fear of him. As a tactical matter, defense counsel may not have objected so the prosecution would not present additional testimony in accordance with the offer of proof.

In any event, " '[a]n improper reference to a prior conviction may be grounds for reversal in itself [citations] but is nonprejudicial "in light of a record which points convincingly to guilt . . . ." ' " (*People v. Allen* (1978) 77 Cal.App.3d 924, 935.) It is not reasonably probable that the jury would have reached a result more favorable to Pachito had the evidence not been divulged to the jury. (*People v. Watson, supra,* 46 Cal.2d at p. 836.)

B

*Prior Domestic Violence*

Lastly, Pachito contends the court abused its discretion by admitting the testimony of Basso on prior domestic violence under Evidence Code section 1109, over his objection under Evidence Code section 352. We find no abuse of discretion.

28

"Under Evidence Code section 1109, evidence of a prior act of domestic violence is admissible to prove the defendant had a propensity to commit domestic violence when the defendant is charged with an offense involving domestic violence. The trial court has discretion to exclude the evidence if its probative value is outweighed by a danger of undue prejudice or confusing the jury, or would result in an undue consumption of time." (*People v. Rucker* (2005) 126 Cal.App.4th 1107, 1114; Evid. Code, §§ 1109, subd. (a)(1), 352.) "The admissibility of evidence of domestic violence is subject to the sound discretion of the trial court, which will not be disturbed on appeal absent a showing of an abuse of discretion." (*People v. Poplar, supra,* 70 Cal.App.4th at p. 1138.)

Pachito asserts the evidence lacked probative value because his conduct toward Basso between 2002 and 2004 bears no resemblance to the charge of criminal threat against Delisle in March 2011. " 'The principal factor affecting the probative value of an uncharged act is its similarity to the charged offense.' " (*People v. Hollie* (2010) 180 Cal.App.4th 1262, 1274 [discussing Evid. Code, § 1108 pertaining to sexual crimes].) We agree with the trial court's assessment the probative value of the evidence was "quite high." Indeed, Pachito's "repeatedly hostile interactions and show of physical force demonstrate a pattern of dominion and violence which provoked fear and intimidation." (*People v. Trujillo Garcia* (2001) 89 Cal.App.4th 1321, 1333.)

We also reject Pachito's assertion his conduct toward Basso was too remote to be probative. Evidence Code section 1109, subdivision (e) provides, "Evidence of acts occurring more than 10 years before the charged offense is inadmissible under this section, unless the court determines that the admission of this evidence is in the interest

29

of justice." The Basso incidents were within the 10-year period, and the trial court explained, "I don't find the staleness to be a problem" since "it's pretty much continuous conduct." Pachito threatened to kill Basso in 2004, and he began physically abusing and intimidating Delisle in 2008.

We also disagree with Pachito's contention Basso's testimony should have been excluded as highly inflammatory as it "besmirched" him and made "him look like a bad guy with women, women other than . . . Delisle." " 'The factors affecting the prejudicial effect and uncharged acts include . . . whether the evidence of uncharged acts is stronger or more inflammatory than the evidence of the charged offenses.' " (*People v. Hollie, supra,* 180 Cal.App.4th at p. 1274.) Pachito asserts Basso's testimony was "much more egregious and inflammatory" than the evidence on the charged offense. In our view, however, Basso's testimony was no more inflammatory than Delisle's testimony of Pachito's history of domestic violence toward her, which was among the circumstances the jury could consider in determining whether he made a criminal threat. (*In re George T., supra,* 33 Cal.4th at p. 637 ["As [§] 422 makes clear, a threat must 'on its face and *under the circumstances* in which it is made, [be] so unequivocal, unconditional, immediate, and specific as to convey . . . a gravity of purpose and an immediate prospect of execution of the threat.' "]; *People v. Gaut, supra,* 95 Cal.App.4th at pp. 1431-1432 [defendant had history of threatening and assaulting victim].) Further, there was no danger of confusing the jury with the evidence of prior domestic violence.

The court properly admitted evidence of prior domestic violence under Evidence Code section 1109. Accordingly, we need not consider Pachito's contention the court

30

erred by also admitting it under Evidence Code section 1101, subdivision (b) on the issue

of intent.[13]

DISPOSITION

The judgment is affirmed.


NARES, J.

I CONCUR:


BENKE, Acting P. J.


I CONCUR IN THE RESULT:


HUFFMAN, J.

_____

[13]      Pachito also contends the court abused its discretion by allowing Basso to testify
that he attacked a male house guest of hers, as the testimony did not fall within the
purview of Evidence Code section 1109.  Pachito does not cite the appellate record to
show he made any objection to this testimony, and thus he has forfeited review of the
issue. (*People v. Chism* (2014) 58 Cal.4th 1266, 1292-1293.)  Further, even if his claim
was preserved it lacks merit because the evidence was not prejudicial under the *Watson*
standard.